MEMORANDUM OF DECISION
This memorandum addresses petitions filed by the Department of Children and Families, hereafter "DCF", to terminate the parental rights of (a) Vernon R. to his son Matthew R. and (b) Shawn K. to his son Brian R. The court grants the termination petitions as to both respondent fathers for the reasons stated below.
 I — BACKGROUND AND PROCEDURAL HISTORY
The evidence showed that in October 1997, Matthew, Brian and their half-sister Samantha were living together with their mother and Samantha's father. On October 12, 1997, Brian, then three years old, went to school with numerous bruises on his face. Physical examination by a doctor at Day Kimball Hospital revealed that he also had bruises on his penis and big toes. When DCF concluded that the parents' stated reasons for these injuries were inconsistent with the nature of the bruises and that the children were in physical danger, DCF invoked a 96-hour hold, took all three minor children in the household into state custody, and CT Page 9119 then obtained an Order of Temporary Custody on behalf of all three children. (Pet. Ex. 3 at 9.) On June 17, 1998, the court, Quinn, J., found Brian, Matthew and Samantha, to be neglected children, entered an adjudication of neglect as to each child, and committed each to the custody of DCF for a one-year period. On November 19, 1999, DCF filed the present petition to terminate the parental rights of Shawn K. to his son Brian. On December 22, 1999, DCF filed the petition to terminate the parental rights Vernon R. to his son Matthew. On December 28, 2000, the court, Quinn, J., accepted the written consent of Shawn K. to termination of his parental rights; this decision addresses below the remaining issue in the TPR petition filed against Mr. K. as to whether termination of his parental rights is in Brian's best interest.
As grounds for terminating the parental rights of Vernon R., DCF has alleged abandonment and no ongoing parent-child relationship. Mr. R. has not appeared in this matter. As his whereabouts was unknown at the time that DCF filed the termination petition, on December 22, 1999, DCF moved for an order of notice of the termination proceedings by publication in the Norwich Bulletin which motion the court, Mack, J., that day granted. On January 12, 2000, the court, Mack, J., confirmed service on Mr. R. by publication in accordance with the court's earlier order and that day defaulted him for failure to appear. The court finds that such notice was proper and adequate under the circumstances here. No counsel was appointed to represent Vernon R. and he did not attend the trial of this proceeding held on March 14, 2001.
At trial the petitioner and the minor children were represented by their respective counsel throughout the proceeding. The petitioner called as its witnesses clinical psychologist Dr. Nancy Randall, D.Psy., who conducted court-ordered psychological evaluations of the minor children, and DCF social worker Diane LaGrega. DCF also introduced five exhibits evidence.
The court finds that the Child Protection Session of the Superior Court for Juvenile Matters has jurisdiction over the pending matter. No action is pending in any other court affecting custody of either child. The court has carefully considered the verified petition, all of the evidence, including the social study and addendum entered into evidence as exhibits, and the testimony presented, according to the standards required by law.[2] Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial.
 II — ADJUDICATORY DECISION
"Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the CT Page 9120 dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the [statutory] grounds for termination of parental rights set forth in [§ 17a-112 (c)] exists by clear and convincing evidence. The commissioner . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . In re Eden F., 250 Conn. 674, 688-89, 741 A.2d 873
(1999)." In re Quanitra M., 60 Conn. App. 96, 102, ___ A.2d ___; cert. denied, 254 Conn. 903 (2000). "In the adjudicatory phase of a termination hearing, the trial court determines if one of the statutory grounds for termination of parental rights is proven by clear and convincing evidence. In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In re Tabitha P., 39 Conn. App. 353, 367,664 A.2d 1168 (1995); Practice Book § 33-3(a). In the present case, the adjudicatory date for Vernon a. is December 22, 1999, the date of the filing of the petition seeking termination of his parental rights.
As to the adjudicatory phase of this hearing of the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect on and until December 22, 1999, when DCF filed the petition to terminate Vernon R.'s parental rights.
A. Reasonable Efforts
To terminate parental rights for a non-consenting parent (here, Vernon R.), DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b
that such efforts are not appropriate." General Statutes § 17a-112
(j)(1). Prior to the commencement of evidence in this case, the petitioner requested the court to take judicial notice from the contents of its own files parties of the fact that on May 26, 1999, the court,Mack, J., found, after a hearing held pursuant to General Statutes §§ 17-17a-110 (b)[3] and 17-17a-111b (b), that further efforts to reunify the respondent with Vernon R. with his son were no longer appropriate, and this court so finds.
B. Statutory Grounds for Termination
To prevail in a non-consensual termination of parental fights case, DCF must prove by clear and convincing evidence in the adjudicatory phase of the proceeding that one of several statutory grounds for termination CT Page 9121 exists. See In re Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes §17a-112 (j)(3). "In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In re Tabitha P., 39 Conn. App. 353,367, 664 A.2d 1168 (1995); Practice Book § 33-3(a).
1. Abandonment
The petitioner has asserted, as one statutory ground for terminating the parental fights of Vernon R., that he abandoned Matthew. Section17a-112 (j) of the General Statutes provides that
 [t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . .
"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [Rev. to 1995] § 17a-112 (b)(1) [now § 17a-112
(j)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . ." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993).
The statute requires DCF to show by clear and convincing evidence that a parent has failed to maintain a reasonable degree of interest in the welfare of his or her child. "Maintain implies a continuing, reasonable degree of concern" not "a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . ." (Internal quotation marks CT Page 9122 omitted.) Id.
The evidence in the present case establishes clearly and convincingly that Mr. R. had, as of the adjudicatory date and through the time of trial, abandoned Matthew. He has had no contact with his son or DCF since at least October 1997. He has never exhibited any of the minimum indicia of parental concern. He never called, visited, sent cards or gifts, or offered financial or emotional support to his son. This is classic evidence of abandonment. The respondent has neither shown nor maintained any interest, concern or responsibility as to his son's welfare. The court therefore finds by clear and convincing evidence that he had, as of the adjudicatory date, abandoned his son.
2. No ongoing parent-child relationship
The other statutory ground alleged for termination of Mr. Vernon R.'s parental rights is the petition's allegation that there is no ongoing parent-child relationship between Matthew and him, pursuant to General Statutes Section 17a-112 (j)(3)(D), which establishes an adjudicatory ground for termination of parental rights where:
 there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child;. . . .
Under this section, the court must "undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In Re John G., 56 Conn. App. 12,22, 740 A.2d 496 (1999). "In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.)In re John T., supra at 23. This standard contemplates a relationship that has some positive attributes. In re Jessica M., 217 Conn. 459, 470,586 A.2d 597 (1991).
The evidence in this case is absolutely crystal clear that there is no ongoing parent-child relationship between Mr. R. and Matthew. Mr. R. has not had any contact with Matthew since at least October 1997, when CT Page 9123 Matthew was two and one-half years old. It is without question that any parent-child relationship that might have then existed, and there is no evidence that one did even then, would have extinguished by force of time in the three and one-half years since. For example, Dr. Nancy Randall, the court-appointed psychologist, reported that Matthew looked to his foster parents to meet his psychological and day-to-day needs and called them mommy and daddy. (Pet Ex. 5 at 8 and 16.) The court therefore finds that the evidence establishes clearly and convincingly that, both on the adjudicatory date and at the time of trial, there was no ongoing parent-child relationship between Mr. R. and Matthew.
"To satisfy the second prong [of the analysis], the trial court [is] required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship. . . . The `best interest' standard, therefore, does not become relevant until after it has been determined that no ongoing parent-child relationship exists." (Citation omitted.) In re Kezia M.,33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915,636 A.2d 847 (1993). The factors to be considered in deciding whether it would be in his best interest to permit further time for a relationship with his father to develop include "(1) the length of stay with [his] foster parents, (2) the nature of [his] relationship with [his] foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of [his] relationship to [his] natural parent." Id.
Having just turned six years old at the time of trial, Matthew has lived in foster care for much of his life.[4] At the time of the psychological evaluation conducted by Dr. Randall in 2000, Matthew had already bonded to his pre-adoptive foster parents. At his age, Matthew needs stability and permanency in his home life and parental caretakers. Mr. Vernon R. has been absent from Matthew's life for the last four years, there is absolutely no evidence that he will ever be available or able to offer Matthew either permanence or stability. The court therefore finds by clear and convincing evidence that it would not be in Matthew's best interest to allow further time waiting for the possibility that Mr. R. might reappear into Matthew's life so that they might develop a parent-child relationship. Accordingly, the court finds by clear and convincing evidence that there is no ongoing parent-child relationship, as defined by the statute and construed by our courts, between Vernon R. and his son Matthew.
 III — DISPOSITION
"If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best CT Page 9124 interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R., 51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a non-consensual case, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes § 17a-112 (k).[5] In reTabitha P., 39 Conn. App. 353, 664 A.2d 1168 (1995). Unlike the adjudicatory phase, on disposition the court may consider information through the close of the evidentiary hearing. Practice Book § 33-5. In the dispositional phase of this case, the court has considered the evidence and testimony related to circumstances and events up to and including March 14, 2001, the date upon which the evidence in this matter was concluded.
A. Required Statutory Findings
In the termination proceeding as to Vernon R., the court makes the following written findings, as required by General Statutes § 17a-112
(k). The court has considered these factors and its findings in determining whether it is in Matthew's best interest to terminate the parental rights of Mr. Vernon R. In re Quanitra M., 60 Conn. App. 96
(2000), cert. denied 255 Conn. 903 (2000).
 1. The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112
(k)(1).
As Vernon R., was never available or accessible during the pendency of this action, there were no services DCF could offer to facilitate his reunion with Matthew.
 2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended — § 17a-112 (k)(2)
DCF made reasonable efforts to find Mr. R. It effected publication in the Norwich Bulletin of the pendency of this action. It sought his whereabouts by contacting state (Department of Corrections and Department of motor Vehicles), federal (Internal Revenue Service) and local (town assessor's office). These were reasonable efforts to find Mr. R., which was the first step in seeking to reunite him with his son. Accordingly, the court finds that DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended. CT Page 9125
 3. The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112 (k)(3)
No orders were ever entered as to Mr. R.
4. The age of the child — § 17a-112 (k)(5)
Matthew is six years old.
 5. The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child — § 17a-112 (k)(6).
The court finds that Mr. R. did not make reasonable efforts to adjust his circumstances, conduct or conditions to make it in Matthew's best interest to be reunited with him. He failed to keep in contact with his son or DCF; only by doing both could reunification have been possible. He did neither.
 6. The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent — § 17a-112 (k)(7).
No unreasonable act of the other parent or any other person prevented Mr. R. from maintaining a reasonable relationship with his son. His economic circumstances played no part in his inability to maintain such a relationship.
B. Best Interests of the Children — § 17a-112 (j)(2)
CT Page 9126
The court is next called upon to determine whether termination of the respondent fathers' parental rights would be in Matthew's and Brian's best interests.[6] From the evidence offered at trial, the court finds by clear and convincing evidence, for the many reasons stated above and below, that it is in Matthew's best interest to terminate the paternal rights of his biological father, Vernon R. The court also finds by clear and convincing evidence that it is in Brian's best interest to terminate the parental rights of his biological father, Shawn K.
The court's analysis of Matthew's best interest begins with his age and needs. It is remarkable and fortunate that, despite the approximately three years that he has spent in foster placement during her three years in DCF custody, Dr. Randall reported that Matthew had shown no apparent psychological issues. He has had difficulty adjusting to loss of a close relationship with Brian, who is placed in a different foster home, and has also shown some indication of sexual acting out but Dr. Randall concluded that he did not appear to be suffering from significant depression or anxiety. According to Dr. Randall, Matthew needs some professional help in dealing with the losses in his life and to understand better what has happened to him. But he is in therapy to help him do so.
A child this age, who has been in foster care for such a a significant portion of his life, needs stability and permanence in his home life and caretakers. Fortunately for him, he has been placed in the same pre-adoptive foster home as his half-sister Samantha. Both have adjusted well to that setting. The court thus finds by clear and convincing evidence that it is in Matthew's best interest to terminate the parental rights of his father, Vernon R.
The court also finds by clear and convincing evidence that it is in Brian's best interest to terminate the parental rights of his father, Shawn K. Brian has a history of emotional and behavioral problems, has shown signs of obsessive compulsive disorder, and needs the security and steadiness of a permanent home. Now seven years old, having spent almost half his life in foster care, Brian needs permanence and stability in his life. The court therefore concludes, taking into consideration Brian's age, his needs, and the totality of circumstances in this case, that it is in his best interest to terminate his father's parental rights and free him for permanent placement elsewhere.
 IV — ORDERS OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and having determined, upon all of the facts and circumstances presented, that it is in the best interest of Matthew and CT Page 9127 Brian to terminate the parental rights of their biological fathers, hereby ORDERS:
The parental rights of Shawn K. are hereby terminated as to Brian R.
The parental rights of Vernon R. are hereby terminated as to Matthew R.
The Commissioner of the Department of Child and Families is hereby appointed the statutory parent for Brian and Matthew for the purpose of securing an adoptive family or other permanent placement for these children; and
Within thirty days of this judgment the Commissioner shall submit a written report addressing such permanency plan; DCF shall file such further reports as are required by state and federal law.
BY THE COURT
 STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CHILD PROTECTION SESSION